IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Steve Pastva, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 22 C 2957 |
| | ) |
| Automobile Mechanics' Local | ) |
| No. 701 Union & Industry | ) |
| Pension Fund, | ) |
| | ) |
| Defendant. | ) |

Memorandum Opinion and Order

Steve Pastva brings this suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, asserting defendant Automobile Mechanics' Local No. 701 Union & Industry Pension Fund (the "Fund") wrongly denied him benefits and unlawfully failed to turn over records. The Fund now moves for summary judgment. For the reasons below, the motion is granted.

I.

The following facts are undisputed unless otherwise noted. At various points during his career, Pastva worked for employers who were parties to collective bargaining agreements ("CBAs") with the Automobile Mechanics' Local No. 701 union. Pursuant to some of the CBAs, certain employers, referred to as "Contributing Employers" in the relevant pension plan documents, made contributions on

behalf of their employees to the Fund. In turn, the Fund provides pension benefits to the employees, subject to the terms of the Automobile Mechanics' Local No. 701 Union and Industry Pension Plan (the "Plan").

It is worth pausing at this juncture to describe some general aspects of how pension benefits work. As an individual works for an employer contributing to a pension plan, that individual accrues benefits under the terms of the plan, terms which must comply with ERISA. "Accrued benefits refer to those normal retirement benefits that an employee has earned at any given time during the course of employment." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 635 n.5 (7th Cir. 2004) (cleaned up); *see also* 29 U.S.C. § 1054 (ERISA's benefit accrual requirements). Eventually, again consistent with plan terms and ERISA, accrued benefits "vest"; "vested benefits . . . refer to those normal retirement benefits to which an employee has a nonforfeitable claim." *Vallone*, 375 F.3d at 635 n.5 (cleaned up); *see also* 29 U.S.C. § 1053 (ERISA's minimum vesting standards). "In short, an employee's vested benefits are the accrued benefits that the employee is actually 'entitled to keep.'" *McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582, 584 (7th Cir. 2005) (quoting *Vallone*, 375 F.3d at 635 n.5). Thus, as is relevant in this case, nonvested benefits can be forfeited or lost.

Pastva worked for the following employers--each of which he claims was a Contributing Employer under the Plan--during the

2

following timeframes: Chicago Freightliner from December 1977 to June 1981; Pollard Motor Company from December 1995 to July 1998; Chicago Mack Sales and Service, Inc., from January 2005 to April 2007; and Rush Truck Center ("Rush") from March 2018 until his retirement in July 2022. All agree that during the intervening periods, Pastva did not work for Contributing Employers. The Fund does not dispute that Pastva worked for these employers during these periods, and it agrees that Pollard Motor Company and Chicago Mack Sales and Service, Inc., were Contributing Employers and made contributions on Pastva's behalf during his employment with them. While the Fund acknowledges that Chicago Freightliner was a Contributing Employer during the relevant period, it says it lacks records of any contributions made by that employer on Pastva's behalf. The Fund denies that Rush is a Contributing Employer at all.

Under the Plan,[1] a participant is eligible for a vested pension if, as relevant here:

> (i) The Participant has one or more Hours of Work on or after January 1, 1999 and his or her Retirement occurs after the accumulation of at least five (5) Years of Vesting Service or at least five (5) Pension Credits earned on the basis of work during the Contribution Period; or

---

[1] In this opinion I refer primarily to the 2014 Plan Document, ECF 40-1, though there were other versions of the plan governing Pastva's benefits before then. I discuss those other versions only where necessary.

3

>   (ii) His or her Retirement occurs after the accumulation of at least ten (10) Pension Credits or ten (10) Vesting Credits earned on the basis of work during the Contribution Period.
>
>   . . .

Plan § 4.3(a), ECF 40-1.

The Plan further provides that a participant "will incur a One-Year Break in Service in any Calendar Year during a Contribution Period in which the Participant fails to complete at least ten (10) Weeks of Work." *Id.* § 6.3(a)(i). A One-Year Break in Service can be repaired, however, "if, before incurring a Permanent Break in Service, the Employee subsequently becomes a Participant in accordance with Section 3.1." *Id.* § 6.3(a)(iii). The relevant provisions regarding Permanent Breaks in Service are as follows:

>   (A) Before January 1, 1987
>
>   A Participant will incur a Permanent Break in Service before 1987 if the Participant has at least two (2) consecutive One Year Breaks in Service, including at least one (1) after 1975, and the number of such consecutive One Year Breaks equals or exceeds the number of Years of Vesting Service or Pension Credits, whichever is greater, with which the Participant has been credited.
>
>   (B) After December 31, 1986
>
>   A Participant will incur a Permanent Break in Service after 1986 if his or her consecutive One Year Breaks in Service equal or exceed the greater of five (5), or the number of Years of Vesting Service or Pension Credits, whichever is greater, with which the Participant has been credited.

4

*Id.* § 6.3(b)(i). Upon incurring a Permanent Break in Service, a nonvested employee's participation in the Plan, as well as "previous Pension Credits, Years of Vesting Service, and Period(s) of Accrual are cancelled" and he must begin anew. *Id.* § 6.3(b)(iii).

Pastva submitted a request for pension benefits to the Fund sometime prior to September 2020. The Fund denied his request in a letter dated September 2, 2020, explaining that he failed to gather enough credits or years of service to vest before incurring Permanent Breaks in Service that canceled his previous service. ECF 40-5. Following this denial, Pastva's attorney sent a letter to the Fund on October 30, 2020, appealing the adverse benefit determination. ECF 40-6. In response, the Fund informed Pastva in December 2020 that it needed additional information from the Social Security Administration ("SSA") regarding his employment history before it could resolve his claim. ECF 40-7. With those supplemental records in hand, the Fund treated Pastva's appeal as an initial claim, which it denied on October 1, 2021, once more because prior to vesting, Pastva incurred Permanent Breaks in Service that canceled his credits and years of service. ECF 40-9. Pastva again appealed, and that appeal was denied on March 9, 2022. ECF 40-10, 40-11. Pastva then commenced this suit.

5

II.

The Plan in this case grants the Fund discretion to determine benefits, so I can overturn its decision only if it was arbitrary and capricious. *See Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007)). The standard is "deferential but 'not a rubber stamp,'" *Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 539 (7th Cir. 2018) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)), and the administrator's decision should be upheld "so long as it 'has rational support in the record,'" *Schane v. Int'l Bhd. of Teamsters Union Loc. No. 710 Pension Fund Pension Plan*, 760 F.3d 585, 589 (7th Cir. 2014) (quoting *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008)).

A.

Under the Plan's terms, Pastva was not entitled to benefits. Even assuming Chicago Freightliner made contributions to the Fund on his behalf from December 1977 through June 1981--recall the Fund concedes Chicago Freightliner was a Contributing Employer during that time, but says it has no records of contributions Chicago Freightliner made to the Fund on Pastva's behalf--that is not enough to get him to the ten pension credits or vesting credits needed for vesting for pre-1999 work under Plan section 4.3(a)(ii).

6

(Nor, for that matter, would it be enough to meet the lower bar of five years of vesting service or five pension credits that kicked in starting in 1999. *See* Plan § 4.3(a)(i).) When he left covered employment from July 1981 through November 1995, he incurred a Permanent Break in Service pursuant to Plan section 6.3(b)(i) because he incurred more than five consecutive One-Year Breaks in Service (which was also more than the number of years he had worked at Chicago Freightliner). That means that as a nonvested employee, any credits or years of service he had received from his time at Chicago Freightliner were canceled. The story is the same for his subsequent periods of work for Contributing Employers through February 2018: each time, he worked for too short a period for his benefits to vest and then accumulated more than five One-Year Breaks in Service (and more than the number of years he had worked at each Contributing Employer) and thus a Permanent Break in Service. The result was cancelation of any credit or years of service he received for time spent working for each Contributing Employer.

Pastva claims to have worked for his final employer, Rush, from March 2018 until July 2022. The Fund maintains Rush is not a Contributing Employer, though Pastva submits CBAs between Rush and the Automobile Mechanics' Local No. 701 union. ECF 49-7, 49-8. The Fund points out, however, that the CBAs do not mention the Fund and instead specify contributions are to be made to a different

7

pension fund, the I.A.M. National Pension Fund, National Pension plan. ECF 49-7 at 8; ECF 49-8 at 8. The administrative record lacks evidence to cast doubt on these contractual terms.[2] Furthermore, even if Rush were a Contributing Employer, at the time Pastva submitted his claim for benefits prior to September 2020, he had not worked long enough at Rush to have been entitled to benefits under the Plan. Thus, I cannot conclude that the Fund acted unreasonably in denying his claim based on the time worked at Rush given the information available at the time.

B.

While the Plan on its terms squarely precluded Pastva from benefits, he contends that those terms violate ERISA. He first takes aim at the Plan's break-in-service rules. Generally, all years of service must be taken into account in computing a participant's period of service for vesting purposes. 29 U.S.C. § 1053(b)(1). Even so,

> . . . in the case of a nonvested participant, years of service with the employer or employers maintaining the plan before any period of consecutive 1-year breaks in service shall not be required to be taken into account

---

[2] Pastva submits affidavits from other Rush employees who attest that Rush contributed to the Fund on their behalf. *See* ECF 49-5, 49-6. These affidavits were apparently not presented to the Fund during Pastva's claim or appeal, so they are outside the administrative record. In any event, the pay statements attached to the affidavits do not show contributions made to the Fund, they simply show that certain deductions were made from those employees' pay for "Union Pension," without identifying any specific fund. *See* ECF 49-5 at 71; ECF 49-6 at 37–38. That cannot displace the clear terms of the CBAs.

>     if the number of consecutive 1-year breaks in service within such period equals or exceeds the greater of--
>
>         (I) 5, or
>
>         (II) the aggregate number of years of service before such period.

*Id.* § 1053(b)(3)(D)(i). And once years are disregarded under this provision, "such years of service shall not be taken into account in applying clause (i) to a subsequent period of breaks in service." *Id.* § 1053(b)(3)(D)(ii). In other words, once years of service are lost pursuant to section 1053(b)(3)(D)(i), they do not later count toward the "aggregate number of years of service" prior to a break in service under section 1053(b)(3)(D)(i)(II).

The Plan mirrors these provisions, disregarding years of service if the participant's "consecutive One Year Breaks in Service equal or exceed the greater of five (5), or the number of Years of Vesting Service or Pension Credits, whichever is greater, with which the Participant has been credited." Plan § 6.3(b)(i)(B).[3] Each of Pastva's Permanent Breaks in Service is

---

[3] The Plan also provides that, prior to January 1, 1987, two consecutive One Year Breaks in Service were enough to result in a Permanent Break in Service. Plan § 6.3(b)(i)(A). While that might be in tension with ERISA's minimum of five consecutive one-year breaks in service before a permanent break in service occurs, such tension is immaterial here because (1) Pastva's breaks in service all exceeded five years anyway and (2) each of Pastva's breaks in service occurred at least partially after 1986, so section 6.3(b)(i)(A) does not apply to him. To be clear, neither party raises this issue, and I do not resolve whether there is in fact any tension between that Plan section and ERISA, but I include

9

based on at least five consecutive One-Year Breaks in Service, and in no instance had he previously worked for a Contributing Employer for more than five years. Thus, consistent with the Plan's terms and ERISA, each period of breaks in service canceled each preceding period of years of service.

Pastva next argues that the Fund's position is untenable because there is no indication that pre-ERISA breaks in service were contractually in place under the Plan. Though not entirely clear from his brief, his position appears to be that the Fund has improperly invoked an exception to crediting years of service found at 29 U.S.C. § 1053(b)(1)(F). That exception "allows a plan to disregard years of service before ERISA became applicable to the plan . . . 'if such service would have been disregarded under the rules of the plan with regard to breaks in service, as in effect on the applicable date.'" *McClain*, 413 F.3d at 585 (quoting 29 U.S.C. § 1053(b)(1)(F)). Since in Pastva's view, the Fund has offered no evidence of pre-ERISA break-in-service provisions under the Plan, the Fund cannot avail itself of this exception. The trouble with this argument is that there is no need for the Fund to resort to this exception, since it stands on firm ground canceling Pastva's years of service for vesting purposes based on section 1053(b)(3)(D), as described above.

---

this comment to make clear that any tension would not pose a problem here.

Pastva also argues that, even if the Fund can disregard years of service for vesting purposes under the exceptions provided in section 1053, which addresses vesting, it must take those years of service into account for benefit accrual purposes because those exceptions are absent from section 1054, which addresses benefit accrual. While true that some courts have held that the difference in language between sections 1053 and 1054 means that breaks in service should be treated differently for vesting and accrual purposes, *see McDonald v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 320 F.3d 151, 156-59 (2d Cir. 2003),[4] the Seventh Circuit has rejected that approach. In *Jones v. UOP*, 16 F.3d 141, 143 (7th Cir. 1994), the court analyzed ERISA's text and purpose and declined "to treat vesting and accrual of benefits differently with respect to breaks in service." The Seventh Circuit has since reaffirmed that conclusion, while registering the Second Circuit's disagreement. *See McClain*, 413 F.3d at 586-87 (finding "the reasoning in *Jones* is sound" and "reaffirm[ing] it here" while calling *McDonald* "unpersuasive"). I must follow Seventh Circuit law.

---

[4] Notably, the Second Circuit in *McDonald* explicitly acknowledged it was charting a different course from that taken by the Seventh Circuit. *See id.* at 159 ("Consequently, we respectfully decline to join the Seventh Circuit's refusal to treat vesting and accrual of benefits differently with respect to breaks in service." (citation and internal quotation marks omitted)).

11

Pastva also asserts the Plan runs afoul of 29 U.S.C. § 1054(b)(1)(G), which states that "a defined benefit plan shall be treated as not satisfying the requirements of [29 U.S.C. § 1054(b)] if the participant's accrued benefit is reduced on account of any increase in his age or service."[5] He does not flesh out how this provision is violated, however. If he means to argue that this provision prevents the Fund from disregarding any years of service due to breaks in service, that argument fails because ERISA expressly allows the Fund to do that, as explored above.

Nor, as Pastva suggests, does the Plan run up against section 1054(g)(1), which states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . ." Pastva does not identify any amendment made to the Plan that affected his accrued benefits.[6] Without that information, a jury could not possibly find for him on this issue. Pastva's argument that the Fund violated section 1054(h)(1) fails for the same reason. That provision states that "[a]n applicable

---

[5] In his brief, Pastva attributes this statutory text to § 1054(g)(1), but that is an entirely different provision (and one that he separately invokes, discussed below). The text quoted by Pastva is from section 1054(b)(1)(G).

[6] Pastva suggests that the Plan was "amended for the first time in 1984" and implies that the break in service provisions were not added until that time. Resp., ECF 46 at 8. But that is not true. The version of the Plan in effect in 1977, when Pastva asserts he became a Plan participant, contains the break in service provisions that were later incorporated into the 2014 version. *See* ECF 54-4 at 23-27 (break in service provisions in effect in 1977).

12

pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual . . . ." *Id.* § 1054(h)(1). Pastva does not identify an amendment that decreased his future rate of benefit accrual, so his assertion fails. Pastva's accrued benefits were affected by the break-in-service terms of the Plan, not by amendments made to the Plan.

C.

Pastva next claims that the Fund refused to hand over the documents, records, and other information that it relied on in denying his claim. In support, he cites to three of his own affidavits, signed after the start of this litigation (on December 1, 2022; January 13, 2023; and January 26, 2024, respectively). ECF 49-1, 49-2, 49-3. He explains that the following documents were not provided to him: (1) "a notice of significant reduction in benefit accruals," ECF 49-1 ¶ 6; ECF 49-3 ¶ 7; (2) "a record or contract showing that pre-ERISA breaks-in-service were contractually in place under the [Plan]," ECF 49-1 ¶ 7; and (3) "plan documents and records . . . relevant to [his] claim despite [his] requests," which he recalls making "in and around the summer and fall of 2020" and also in 2021 and 2022, ECF 49-2 ¶ 3; ECF 49-3 ¶ 4.

13

As to the first, as explained above, there was no requirement that the Fund provide a notice of reduction in benefit accruals under sections 1054(g)(1) or 1054(h)(1) because there is no evidence of an amendment having that effect. Similarly, the Fund had no obligation to turn over the second category of documents because, again as explained above, they are not relevant to his claim. All of his work was performed after ERISA took effect and the Fund's decision does not depend on the existence of pre-ERISA break-in-service Plan provisions. And Pastva cannot proceed on the third category because he does not specify the requests he claims to have made.

Pastva also argues in his response brief that he was not provided with a summary plan description as required. But he cites no evidence, not even an affidavit, to support this contention, so it cannot proceed past summary judgment.

Relatedly, Pastva invokes the recordkeeping requirements of 29 U.S.C. §§ 436 and 1059 and claims the Fund violated these provisions by failing to keep accurate records and to account for his years of service and accrued benefits.[7] Though not entirely

---

[7] Section 1059 also contains certain reporting requirements, but Pastva does not argue these provisions were violated. The Fund, for its part, maintains sections 436 and 1059 do not apply to multiemployer pension funds, but rather to labor organizations in the case of section 436 and employers in the case of section 1059. I do not address these arguments, however, since, as I will discuss, Pastva's recordkeeping claims are insufficient anyway.

14

clear, it appears that Pastva believes the Fund failed to maintain the following: records of contributions paid on his behalf by Chicago Freightliner and records of contributions paid on his behalf by Rush. It is true that the Fund does not have records of contributions on Pastva's behalf from Chicago Freightliner and the Fund admits that Chicago Freightliner was a Contributing Employer during the relevant period. However, Pastva was not harmed by any failure on the Fund's part to maintain those records because, as explained above, his work for Chicago Freightliner would have canceled out anyway due to a Permanent Break in Service. The lack of records regarding Pastva's employment with Rush is also addressed above: the evidence suggests that Rush was required to make contributions to a different fund and, even if it was supposed to contribute to this Fund, at the time Pastva submitted his claim he would not have been entitled to benefits based on the time worked at Rush.

D.

Finally, Pastva argues the Fund violated its fiduciary duties in various ways. Pastva is correct that under ERISA, the Fund acts as a fiduciary and as such has certain duties, including the duties of loyalty and care or prudence. Pastva's attempts to pin down how the Fund breached those duties in this case each fail, however, as they largely consist of the same arguments I have already rejected reframed through the lens of fiduciary duty. He maintains that the

15

Fund breached its fiduciary duties by: (1) "failing to maintain accurate records"; (2) "failing to respond to [his] requests for information"; (3) "under reporting [his] Covered Employment"; (4) "miscalculating [his] Pension contributions"; and (5) "adopting a position that is not supported under the Summary Plan Description, ERSIA, or federal case law." Resp. at 2.

As to the first alleged violation, to the extent the Fund was required to maintain accurate records, and assuming the Fund in fact failed to maintain those records, Pastva fails to identify how the Fund's failure caused him any harm as explained above.

Pastva's claim that the Fund failed to respond to his requests for information is similarly addressed above. To repeat, he does not sufficiently identify what information he requested.

Pastva's claim that the Fund underreported his Covered Employment appears to refer to the fact that the Fund did not credit him with time worked at Chicago Freightliner because it lacks records of contributions made on his behalf during this period and the fact that the Fund maintains Rush is not a Contributing Employer. But Pastva's asserted employment with Chicago Freightliner would make no difference and the evidence supports that Rush is not a Contributing Employer. And again, even if Rush were a Contributing Employer, he filed his claim with the Fund before he had any vested benefits.

16

The fourth and fifth categories are related and appear to map onto his argument that the Fund was not allowed to apply the break in service provisions as they appear in the Plan. That is incorrect for the reasons given above.

In addition, Pastva explains that ERISA fiduciaries must conduct thorough investigations before investing the funds with which they are entrusted, but does not connect this duty to the Fund's alleged actions in this case, where there is no allegation regarding the Fund's investment decisions. Indeed, each of the cases he cites for this proposition concerned suits by plan participants or beneficiaries based on alleged imprudent investments or other financial mismanagement. Beyond the investment context, Pastva does not elaborate on how the Fund in this case inadequately investigated anything or what a more adequate investigation would have revealed.

## III.

For the foregoing reasons, the Fund's motion for summary judgment is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 15, 2024